1  Wendy J. Harrison (State Bar No. 151090)
   BONNETT FAIRBOURN FRIEDMAN
2    and BALINT, P.C.
   2901 North Central Avenue, Suite 1000
3  Phoenix, Arizona 85012
   Telephone: 602-274-1100
4  Facsimile: 602-274-1199
   wharrison@bffb.com
5  *Attorneys for Plaintiff*

6              UNITED STATES DISTRICT COURT

7            NORTHERN DISTRICT OF CALIFORNIA

8  SCOTT RUTH,                          )  No.
                                        )
9                   Plaintiff,          )  CLASS ACTION
                                        )
10      vs.                             )  COMPLAINT FOR VIOLATION OF THE
                                        )  SHERMAN ACT, STATE ANTITRUST
11 SONY BMG MUSIC ENTERTAINMENT,        )  STATUTE AND FOR UNJUST
   SONY CORPORATION OF AMERICA,         )  ENRICHMENT UNDER STATE LAW
12 BERTELSMANN, INC., UNIVERSAL         )
   MUSIC GROUP, TIME WARNER, INC.,      )
13 WARNER MUSIC GROUP CORP. and EMI     )
   GROUP, PLC,                          )  DEMAND FOR JURY TRIAL
14                                      )
                    Defendants.         )
15 _____)

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.     Plaintiff Scott Ruth, on behalf of himself and the classes defined herein (the "Classes"), based on information and belief and investigation of counsel, except for information based on his personal knowledge, alleges as follows:

2.     This action is brought by Plaintiff on behalf of all persons and entities who have paid inflated prices for: (1) digitally formatted music offered for sale on the Internet ("Online Music") and (2) compact discs ("CDs"). In furtherance of, and as an integral part of, their conspiracy to fix and maintain prices, Defendants, a combination of the major music labels and media conglomerates, restrained the availability and distribution of Online Music. Defendants engaged in a prolonged pattern of concerted conduct to prevent and delay Online Music from becoming a competitive alternative to their near monopoly of the CD market. Ultimately, when Online Music became inevitable, Defendants then conspired to fix and maintain the prices for such product. As a result of Defendants' conspiratorial and anti-competitive conduct, Plaintiff and members of the Classes have paid more for Online Music and CDs than they would have in a market free from Defendants' competitive restraint.

3.     Defendants' conduct violates, *inter alia*, the Sherman Act, the Arizona Antitrust Act ("AAA") and Arizona common law of unjust enrichment. Plaintiff seeks an order enjoining Defendants' anticompetitive conduct and damages for himself and the Classes as a result of Defendants' unlawful conduct.

**PARTIES**

4.     Plaintiff Scott Ruth ("Plaintiff") is a resident of the State of Arizona, County of Maricopa. Plaintiff has purchased numerous CDs, as well as Online Music, produced, licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the filing of this Complaint. As a result of Defendants' unlawful conduct alleged herein, Plaintiff has suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

5.     Defendant Sony BMG Music Entertainment ("Sony BMG"), is a Delaware general partnership, with its principal place of business in New York and a corporate office in Santa Monica,

1   California.  Defendant Sony BMG was formed as a joint venture of Defendant Sony Corporation and

2   Bertelsmann AG to operate their merged music operations.  In or about August 2004, Defendants

3   Sony and Bertelsmann merged their U.S. music operations and purportedly transferred their

4   respective musical copyrights, licensing agreements and royalty rights to Defendant Sony BMG,

5   which is organized under the laws of New York.  Defendant Sony BMG maintains its principal

6   headquarters in New York City.  As a result of its formation, Sony BMG now owns and controls

7   music released under such record labels as Arista, Columbia, Epic, and RCA Records.  Defendant

8   Sony BMG produces, licenses and distributes Online Music and CDs through a wide variety of

9   retailers, some of whom are owned and/or controlled by Defendant Sony BMG or their corporate

10  parents, Defendants Sony and Bertelsmann.

11          6.       Defendant Sony Corporation of America ("Sony"), is a New York corporation with

12  its principal place of business in New York, and is the U.S. subsidiary of Sony Corporation, which is

13  based in Tokyo, Japan.  In addition to its music operations and large electronics business, Sony also

14  owns Sony Pictures Entertainment, Columbia TriStar Pictures, and Sony Playstation.

15          7.       Defendant Bertelsmann, Inc. ("Bertelsmann"), is a Delaware corporation with its

16  principal place of business in New York, and is the U.S. subsidiary of Bertelsmann AG, whose

17  headquarters is in Gütersloh, Germany.  Bertelsmann AG also owns dozens of radio and television

18  stations in Europe; major book publishers including Random House, Bantam-Dell, Crown, Fodor's,

19  Ballantine, Doubleday, and Knopf; the Columbia House CD club; and major magazines such as

20  Family Circle, Parents, and YM.

21          8.       Defendant Universal Music Group ("UMG"), is a Delaware corporation with its

22  headquarters in Santa Monica, California.  Defendant UMG is a subsidiary of Vivendi Universal

23  S.A., headquartered in Paris, France.  Vivendi is a conglomerate that in addition to its music

24  business, owns many of the leading media and telecommunication companies in Europe and Africa

25  and is also one of the world's largest video game developers.  UMG owns and controls music sold

26  under such record labels as Mercury, Interscope, Geffen, A&M, Island Def Jam, Philips and Polydor

27

28

1  Records.  Defendant UMG produces, licenses and distributes Online Music and CDs through a wide

2  variety of retailers, some of whom are owned and/or controlled by Defendant UMG.

3       9.     Defendant Warner Music Group Corp. ("Warner"), is a Delaware corporation with its

4  principal corporate headquarters located in New York City.  Warner owns and controls music

5  released under such record labels as Warner Bros., Asylum, Bad Boy, We Put Out, Reprise, Sire,

6  Atlantic, Elektra, and London Records.  Defendant Warner produces, licenses and distributes Online

7  Music and CDs through a wide variety of retailers, some of whom are owned and/or controlled by

8  Defendant Warner or its corporate parent Time Warner.

9       10.     Defendant Time Warner, Inc. ("Time Warner"), is the largest media conglomerate in

10  the world, with its headquarters in New York City.  In addition to Warner Music Group Corp., it

11  owns America Online ("AOL"), HBO, CNN, Court TV, TBS, TNT, the WB Network, Turner

12  Classic Movies, Cartoon Network, Time Warner Cable, Road Runner Hi-Speed Internet,

13  Kablevision, New Line Cinema, Warner Brothers Studios, Castle Rock Entertainment, Hanna-

14  Barbera, Warner Books, Time Life, Little Brown, Sports Illustrated, Fortune, Money, People,

15  Entertainment Weekly, Southern Living, Field & Stream, Golf Magazine, DC Comics, America

16  Online, CompuServe, Netscape, MapQuest, Warner Brothers Theme Parks, and the Atlanta Braves.

17       11.     Defendant EMI Group, PLC ("EMI"), is headquartered in London.  EMI operates in

18  over 25 countries, and operates in the United States through wholly owned subsidiaries including

19  EMI Group North America, Inc., a Delaware corporation.  At various times, Defendant EMI has

20  signed and released music from The Beatles, The Beach Boys, The Byrds, The Hollies, and Pink

21  Floyd.  Defendant EMI owns and controls music released under such record labels as Apple, Blue

22  Note, Capitol, Chrysalis and Virgin Records.  Its largest United States operation is Capitol Records,

23  a Delaware corporation headquartered in Los Angeles.  Its other major subsidiaries in the United

24  States are Astralwerks, Caroline Distribution, EMI Christian Music Group, EMI CMG Distribution,

25  EMI Gospel, EMI Latin, EMI Music Publishing Nashville and Virgin Records.  Defendant EMI

26  produces, licenses and distributes Online Music and CDs through a wide variety of retailers at least

27  one of whom is owned and/or controlled by Defendant EMI.

28

1    12.    Defendants Sony BMG, Sony, BMG, UMG, Time Warner, Warner and EMI are

2   collectively referred to herein as "Defendants." UMG, Sony BMG, EMI, and Warner are

3   collectively referred to herein as "Defendant Labels." Defendants, directly or through a division,

4   parent, subsidiary or agent, have had actual knowledge of, and have knowingly participated in, the

5   conspiracy to fix the prices for Online Music and CDs, including the restraint of the availability and

6   distribution of Online Music.

7    13.    The acts charged in this Complaint to have been done by Defendants were authorized,

8   ordered, and done by its officers, employees, agents, members or representatives while actively

9   engaged in the management, direction, control or transaction of the business or affairs of each of the

10  Defendants.

11                              **UNNAMED CO-CONSPIRATORS**

12    14.    Co-conspirator Recording Industry Association of America ("the RIAA") is a trade

13  organization claiming to represent companies that "create, manufacture and/or distribute

14  approximately 90% of all legitimate sound recordings produced and sold in the United States." It is

15  located at 1330 Connecticut Avenue, NW, Suite 300, Washington, DC 20036. The RIAA lobbies on

16  behalf the industry and frequently represents its members in litigation. All Defendant Labels are

17  members of the RIAA, directly or through their subsidiaries, and Defendant Labels have control over

18  the organization by providing a majority of its budget and nominating the majority of its board of

19  directors. RIAA has conspired with Defendants and participated in the illegal activities described

20  herein. The self-described function of the RIAA "is to foster a business and legal climate that

21  supports and promotes our members' creative and financial vitality." In fact, RIAA provides

22  Defendants with a forum to exchange competitive information and to coordinate their scheme to

23  restrain the availability and commercial development of Online Music.

24    15.    Various other persons, firms, corporations, or joint ventures not named defendants in

25  this lawsuit, the identities of which are presently unknown, may have participated as co-conspirators

26  with each of the Defendants' illegal activities in this Complaint and have performed acts and made

27  statements in furtherance of the illegal combination and conspiracy.

28

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS
& PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW

**JURISDICTION AND VENUE**

16.    Jurisdiction is conferred upon this judicial district pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, and 28 U.S.C. §§1331 and 1337.

17.    This Court also has diversity jurisdiction over the Classes pursuant to 28 U.S.C. §§1332(d)(2) and (6) of the Class Action Fairness Act of 2005 because one or more members of the Classes defined herein are citizens of a State different from one or more Defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

18.    Venue is proper in this district pursuant to §§4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391 because Defendants transact business in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district. The acts complained of have had, and will have, substantial anticompetitive effects in this district. Finally, at least two other cases are pending in this district concerning the subject matter alleged herein.

**TRADE AND COMMERCE**

19.    During the Class Period, each of the Defendants, itself or through their affiliates, agents or subsidiaries, produced, licensed, distributed and/or sold Online Music and CDs in a continuous and uninterrupted flow of intrastate and interstate commerce throughout the United States.

**RELEVANT MARKET**

20.    As to claims so requiring, the relevant product markets for purposes of this action are the market for Online Music and the market for CDs. The relevant geographic market is the United States.

21.    Defendant Labels are the four largest music labels and control in excess of 85% of the market for all Online Music sold in the United States and in excess of 85% of the market for all CDs sold in the United States. Defendant Labels function as an oligopoly. Jointly they exercise market power over and dominate the market for Online Music and the market for CDs.

1

## FACTUAL BACKGROUND OF DEFENDANTS' ANTICOMPETITIVE CONDUCT

2

3      22.      Defendant Labels produce, license and distribute Online Music and CDs to retailers

4   for sale throughout the United States and in some instances sell Online Music and CDs directly to

5   consumers through Internet sites, record clubs and other entities which they own or control.  For

6   example, Defendants Bertelsmann, EMI, Sony, and Time Warner sold music directly to consumers

7   over the Internet through their Music.net joint venture.  Defendants Sony and UMG sold Online

8   Music directly to consumers through their joint venture pressplay.  Defendant Sony sells Online

9   Music directly to consumers using its online store Sony Connect.  Defendant Sony BMG sells CDs

10  to consumers directly on Sony Music Store and other channels.  Defendant UMG, through Universal

11  Music Store, sells CDs directly to consumers.  Defendant BMG sells music directly to consumers

12  through its BMG Music Club service.  In 2005, Defendant BMG's parent Bertelsmann AG acquired

13  Columbia House, BMG Music Club's only large competitor in the United States, through which it

14  sells CDs directly to consumers.  Defendant Time Warner sells Online Music to consumers on its

15  online store AOL Music Now.  Defendant Time Warner sells CDs directly to consumers using AOL

16  Music and through other channels.

17      23.      The music industry and the markets for Online Music and CDs have been changing

18  rapidly in recent years due to technological advances and consumer preferences.  Transmitting music

19  electronically to consumers via the Internet has worked a revolutionary change to the business model

20  of Defendant Labels by exponentially increasing the speed and amount of music that can be

21  distributed while dramatically reducing costs associated with music production, distribution and sale

22  through the now traditional medium of CDs.  Pricing for CDs accounts for costs such as producing a

23  master disc; producing copies of the disc; the CD case; artwork; label, branding and anti-shoplifting

24  packaging; importing the CDs into the United States; shipping CDs to distribution warehouses and

25  then to record stores; labor to unpack and shelve the CDs and man the cash registers; and returning

26  and/or destroying unsold inventory.  All of these costs are eliminated when music is distributed

27  online.

28

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS & PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW

- 6 -

24.     In addition to being far cheaper and instantaneous, online distribution of music benefits the consumer, who does not have to drive to a store, does not have to worry about care and storage of the CD, and can instantly store the purchased music onto a computer or portable music device such as Apple's iPod or an MP3 player.  Indeed, for many consumers, Online Music is the proverbial "better mousetrap."  Online Music is imminently portable, allows consumers to choose and purchase only those selections they desire instead of entire CDs, and allows consumers to load enormous audio libraries that not long ago would have required an entire room to house into their portable music devices.  But for Defendants' anticompetitive conduct, Online Music would be dramatically less expensive than CDs.

25.     The underlying Online Music technology (the ability to collect payment and to transmit music digitally over the Internet) has been available at least as early as 1994.  In a competitive market, lower costs and strong demand for these improved technologies would have created a larger market for low-cost Online Music years earlier as consumers switched from CDs to purchasing Online Music *en masse*, much as they switched from cassette tapes to CDs a generation earlier.  This change-over has not happened yet because Defendants have used their near-complete monopoly over music licensing to stifle the growth and efficiencies of the Online Music market.  For example, in 1998, Defendants, acting through their trade organization and co-conspirator, the RIAA, sued to enjoin the importation or sale in the United States of the Diamond Rio portable music player, the direct forerunner of the enormously popular Apple iPod.  This lawsuit proved unsuccessful, and as the technology of portable music players improved, demand increased.

26.     The distribution of digital music exploded in the late 1990s with the emergence of Napster, the most popular online music service (which had tens of millions of users), Kazaa and other services offering free peer to peer file sharing, *i.e.*, the ability of one person to share Online Music with anyone else via a website.  These services demonstrated the viability of distributing music online.  Although Napster initially provided file sharing for free, ultimately it attempted to negotiate with the Defendants to charge for Online Music.  Defendants rejected offers by Napster to license their music catalogues for sale online.  Defendants' concerted refusal to deal with Napster

1  thus eventually forced the most promising and popular Online Music service into bankruptcy. The

2  Napster brand has since been resurrected and Defendants Sony and UMG are minority shareholders

3  in the venture.

4      27.     During the summer of 2001, and while Defendants were successfully shutting down

5  Napster, Defendants formed two joint ventures to sell Online Music: MusicNet and pressplay. At

6  the time, MusicNet was owned by BMG, Warner and EMI, while UMG and Sony owned pressplay.

7  These were not serious commercial ventures, but rather attempts to occupy the market with

8  frustrating and ineffectual services in order to head off viable Online Music competitors from

9  forming and gaining popularity after Napster's demise. Defendants placed so many onerous

10 restrictions on the music files once they were downloaded that one prominent computer industry

11 magazine noted that "nobody in their right mind will want to use" the services.[1] For example,

12 pressplay allowed only 10 songs to be burned to a CD per month, and no more than two of them

13 could be by the same artist. On MusicNet, downloaded songs would expire every 30 days and had to

14 be downloaded again and again each month, and customers were forced to download software that

15 would "take over their computers" by automatically changing default settings and placing desktop

16 and other shortcuts, to name a few of the software's unwanted features. Neither service allowed

17 music to be played on the Apple iPod, the most popular portable music player, nor did either service

18 make Defendants' whole catalog available for download. Even the songs that were available for

19 download on MusicNet and pressplay were in a below-CD quality audio format despite the wide

20 availability of technology which would have cured this substantial defect. Predictably, neither

21 MusicNet nor pressplay had success with consumers.

22     28.     Nonetheless, as of mid-2001 Defendants continued to hold firm to their concerted

23 decision not to license any Online Music services to provide their music catalogues for sale to

24 consumers. This refusal to grant meaningful licenses to an entity which Defendants did not own or

25 control delayed and retarded the eventual growth of the Online Music market. Defendants sought to

26 _____

27 [1]     PC World, Digital Music: Worth Buying Yet?, 1/18/02.

28

1   forestall and then distort the development of the Online Music market because it would decrease

2   Defendants' CD sales and their considerable profit margins on CDs.

3       29.     Not only were MusicNet and pressplay inferior to Napster and other services, but

4   Defendants imposed anti-competitive conditions upon Online Music services that licensed music via

5   MusicNet. The pricing structure of the contract was such that the licensee would have to pay

6   penalties in the form of higher prices for Defendants' music if the licensee licensed music from any

7   company other than MusicNet. This not only restrained trade in the Online Music business, but also

8   prevented the small independent labels that competed with Defendants from obtaining access to

9   online outlets.

10       30.     Defendants were paid shares of the total revenue generated by a joint venture licensee

11   rather than receive money on a per song basis. Because each Defendant Labels' financial interest in

12   the joint ventures was therefore linked to the total sales of all the labels rather than its own market

13   share, Defendant Labels had no incentive to compete with one another.

14       31.     The financial structure of the joint ventures encouraged Defendant Labels to engage

15   in cartel behavior rather than competition. Defendants are no strangers to lawsuits and government

16   investigations for anticompetitive behavior related to sales of recorded music. Beginning in the mid-

17   1990's, discount retailers such as Target and Circuit city entered the CD market, offering discounts

18   and gaining market share from traditional music retailers, threatening "the high and stable profit

19   margins for CDs."[2] Defendants were sued by numerous State Attorneys General's private plaintiff

20   for allegedly agreeing to impose minimum advertised price policies that harshly penalized retailers

21   for selling below the price set by the record labels. Defendants settled the suit in 2003 against them

22   for this illegal anticompetitive behavior for $140 million and an injunction against further minimum

23   advertised price policies.

24

25

26   _____

[2]     Plaintiff States' Third Amended Complaint, *Florida, et al. v. BMG Music, et al.*, Docket
27   No. 2:01-CV 84-P-H.

28

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS
& PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW

32.     In another example of recent anticompetitive behavior, the Attorney General of New York and the Federal Communications Commission are further investigating Defendants for their "payola" schemes of paying radio stations for playing certain songs, an illegal practice that locks out new artists and smaller record companies. Sony BMG and Warner have settled with the New York Attorney General, while the case against the rest of the Defendants is ongoing.

33.     The MusicNet and pressplay joint ventures also provided Defendants with opportunities and forums to meet and further conspire to cooperate to maintain the prices of all their music products. In antitrust cases brought by the creditors of the bankrupt Napster against the record labels, the Court wrote, "even a naïf must realize that in forming and operating a joint venture, [record label] representatives must necessarily meet and discuss pricing and licensing . . . [t]hese joint ventures bear the indicia of entities designed to allow [record labels] to use their copyrights and extensive market-power to dominate the market for digital music distribution. Even on the undeveloped record before the court, these joint ventures look bad, sound bad and smell bad."[3] The joint venture provided the vehicles through which Defendants attempted to control the emergence and growth of Online Music in order to protect their sales of and margins on CDs.

34.     It was not until the phenomenal success of Apple's iPod portable music players and the creation of Apple's iTunes Music Service in 2003 that Defendants finally relented and allowed their music to be licensed for online distribution in a form not crippled by heavy restrictions or distributed by one of their collusive joint ventures. Thus, widespread distribution of Online Music through iTunes, to be played on iPods, occurred more than eight years after the underlying technology became widely available.

35.     In sum, Defendants' concerted refusals to deal with Napster and to authorize an independent Online Music entity to distribute and sell downloads were designed to maintain the sales volume, pricing and profits they obtained through CDs. Defendants sought to delay the Online

_____

[3]     *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1109 (N.D. Cal. 2002) (internal citations omitted).

1   Music market through their joint ventures and, when they could not hold back market forces any

2   longer, they conspired to set the wholesale price of Online Music at supracompetitive levels to

3   protect the CD market.

4           36.     Defendants have continued to nakedly restrain trade in the market for Online Music

5   by engaging in price fixing.  When Defendants first entered the market with their joint ventures, they

6   charged as little as $10 for 50 songs, or 20 cents per song.  Defendants have now agreed to a

7   wholesale price floor at which they sell Online Music to retailers at or about 70 cents per song.

8   Further restraining competition in the Online Music market, Defendants use their market power to

9   coerce Online Music retailers to sign "most favored nation" agreements that specify that the retailers

10  must pay each of the Defendant Labels the same amount.  By setting a wholesale price floor at 70

11  cents per song, Defendants have fixed and maintained the price of Online Music at supracompetitive

12  levels.  Additionally, virtually all songs were licensed by Defendant Labels at the exact same price

13  without regard to the artist, its popularity, its length or vintage.  Now Defendants are collectively

14  pressuring Apple to raise its price above the current 99 cents per song.  By comparison, an online

15  music service that serves the much smaller independent or "indie label" market, eMusic, charges $10

16  for each 40 songs, or 25 cents per song.

17          37.     Defendants' price fixing of Online Music is also the subject of a pending

18  investigation by New York State Attorney General Eliot Spitzer who subpoenaed Defendants for

19  information on the wholesale prices they charge for Online Music.  On March 3, 2006, the United

20  States Department of Justice opened an investigation into collusion and price fixing of Online Music

21  by the Defendant Labels.  The Defendant Labels either have received or will soon receive formal

22  "civil investigative demands," which are similar to subpoenas.

23          38.     A primary motive for Defendants' suppression of trade in the Online Music market

24  was to protect their investment in the CD market and allow them to maintain their enormous profits

25  until they transitioned from highly profitable CDs to Online Music.  The advantages of Online Music

26  distribution, unless the price is fixed at the appropriate price, threaten this investment in three ways.

27  First, there is only a limited amount of shelf space in record stores and Defendants use their market

28

1   power to crowd out all but the most popular CDs produced and distributed by smaller competing

2   labels. Online Music sites, by contrast, can offer an unlimited amount of music, giving consumers

3   more access to the catalogues, artists and songs of Defendant Labels' competitors. The emerging

4   Online Music market is a threat to Defendants' oligopoly. Second, the Online Music market allows

5   consumers to choose and only pay for the songs they want, rather than being forced to buy an entire

6   CD mostly full of what they perceive as "filler." Third, Online Music threatens Defendants' practice

7   of bundling content. Bundling allows Defendants to engage in price discrimination against

8   consumers with different preferences. Even if some consumers do not perceive the additional songs

9   on each CD to be worthless filler, they still accord them different values. For example, if A is

10   willing to pay $3 for song one and $2 for song two, and B has the opposite preference, the vendor's

11   maximum revenue would be $8 if they were sold separately, because it is not able to charge more

12   than $2 each and still make four sales. However, if the two songs were bundled together and sold for

13   $5, the company would have revenue of $10.

14       39.     Before Online Music, selling songs together was the only practical way to sell music.

15   Few people would want to eject a CD from a CD player and put in a new one at the end of every

16   song, and material and packaging prices made selling music by individual song even more

17   impractical. When purchasing Online Music, consumers now have the choice of purchasing entire

18   albums or individual songs. Enormously popular iPods and MP3 players allow consumers to group

19   individual songs by artist, genre, play lists, album name or otherwise together according to their own

20   personal preferences. The new and expanding Online Music market demonstrates that the vast

21   majority of consumers prefer to purchase individual songs. This preference was not lost on

22   Defendants, who quickly realized that failure to price Online Music, where consumers could

23   purchase a single song instead of an entire album, at less than supracompetitive levels would

24   seriously erode the CD market and Defendants' profits.

25       40.     By conspiring to restrain the growth of Online Music and to set a price floor for

26   Online Music at supracompetitive levels, Defendants have protected their ability to maintain sales of

27   CDs at prices higher than they would be but for Defendants' anticompetitive conduct.

28

**CLASS ACTION ALLEGATIONS**

41.     Plaintiff brings this action on behalf of himself, and all others similarly situated, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to represent the following Classes:

**Injunctive Relief Class**

42.     All persons or entities in the United States (excluding federal, state and local governmental entities, Defendants, their directors, officers and members of their families) that purchase Online Music produced, manufactured, licensed, distributed and/or sold by Defendants.

**End Purchaser Online Music Damages Class**

43.     All persons or entities in Arizona (excluding federal, state and local governmental entities, Defendants, their directors, officers and members of their families) that purchased Online Music produced, manufactured, distributed and/or sold by Defendants from March 7, 2002 through the conclusion of the trial of this matter ("Class Period"), other than those who purchased Online Music directly from Defendants or an entity owned or controlled by Defendants.

**End Purchaser CD Damages Class**

44.     All persons or entities in Arizona (excluding federal, state and local governmental entities, Defendants, their directors, officers and members of their families) that purchased CDs produced, manufactured, distributed and/or sold by Defendants during the Class Period, other than those who purchased CDs directly from Defendants or an entity owned or controlled by Defendants.

45.     Excluded from each of the Classes are Defendants, there directors, officers and members of their families; any entity which any Defendant owns, controls or has controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of any Defendant; and any federal, state or local governmental entity.

46.     The Classes are so numerous that joinder of all members is impracticable.  There are thousands of members in the Classes who are geographically dispersed throughout the United States and Arizona.

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS & PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW

- 13 -

1   47. Plaintiff's claims are typical of the claims of the members of the Classes because
2 Plaintiff and all Class members were damaged by the same wrongful conduct of the Defendants
3 alleged herein.

4   48. There are questions of law and fact common to the Classes which predominate over
5 any questions affecting only individual Class members.  Such common questions include:

6     (a) Whether the Defendants violated the Sherman Act and the Arizona Antitrust
7 Act by engaging in a continuing combination and conspiracy to restrain the availability and
8 distribution of Online Music and fix and maintain the prices for Online Music and CDs;

9     (b) The duration and extent of any such combination or conspiracy alleged;

10     (c) Whether the Defendants and each of them were participants in any such
11 combination or conspiracy alleged herein;

12     (d) Whether Defendants fixed the price of Online Music at supracompetitive
13 levels;

14     (e) Whether Defendants fixed the price of CDs at supracompetitive levels; and

15     (f) Whether Defendants' conduct caused damage to Plaintiff and members of the
16 Classes, and if so, the appropriate measure of such damages.

17   49. The claims of the Plaintiff are typical of the claims of the Classes, and Plaintiff has no
18 interest adverse to the interest of other members of the Classes.

19   50. Plaintiff will fairly and adequately protect the interests of the Classes and has retained
20 counsel experienced and competent in the prosecution of complex class actions and antitrust
21 litigation.

22   51. A class action is superior to other available methods for the fair and efficient
23 adjudication of the controversy.  Such treatment will permit a large number of similarly situated
24 persons to prosecute their common claims in a single forum simultaneously, efficiently, and without
25 duplication of effort and expense that numerous individual actions would engender.  Class treatment
26 will also permit the adjudication of relatively small claims by many Class members who could not
27 afford to individually litigate an antitrust claim against large corporate Defendants.  There are no

28

1  difficulties likely to be encountered in the management of this class action that would preclude its

2  maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication

3  of the controversy.

4       52.    Defendants have acted on grounds generally applicable to the entire Class, thereby

5  making final injunctive relief or corresponding declaratory relief appropriate with respect to the

6  Class as a whole.

7  ## COUNT I

8  ### For Violation of Section 1 of the Sherman Act
### (On Behalf of All Classes)

9

10       53.    Plaintiff realleges and incorporates by reference each and every allegation set forth

11  above. This Count is brought pursuant to 15 U.S.C. §1 and 15 U.S.C. §16, for injunctive relief as to

12  all Classes.

13       54.    The record music industry is dominated by four entities — Defendant Labels EMI,

14  Sony-BMG, UMG and Warner — which collectively function as a highly concentrated, tightly-knit

15  oligopoly. Together, Defendant Labels account for over 85% of music sold to end purchasers in the

16  United States. The relatively few firms and their market-share stability over time have created an

17  industry environment which enables and facilitates Defendants' ability to coordinate their pricing

18  and other related practices. This market-share stability is inconsistent with an industry that has been

19  subject to sweeping advancements in technology and changes in public taste and fashion for music

20  and the vehicles and media through which music is distributed and sold.

21       55.    The recorded-music industry is also characterized by high barriers to entry by new

22  firms, thus further enhancing Defendants' significant market power. The high degree of

23  concentration in the industry and the significant barriers to entry have insulated Defendants from

24  price competition from new entrants to the market.

25       56.    Beginning at least as early as March 7, 2002, the exact date being unknown to

26  Plaintiff, and continuing to the present, Defendants and their co-conspirators have engaged in a

27  continuing combination, conspiracy, and common course of conduct in unreasonable restraint of

28  interstate trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1. As more fully

1  described herein, the combination, conspiracy and common course of conduct engaged in by

2  defendants consisted of a continuing agreement, understanding and concert of action among the

3  Defendants and their co-conspirators, the substantial terms of which were to restrain the availability

4  and distribution of Online Music and then to fix and maintain at artificially high and non-competitive

5  levels the prices at which they sold Online Music. By restraining trade in and fixing the price of

6  Online Music, Defendants were able to further their scheme to protect the market for sales of CDs

7  and maintain at artificially high and non-competitive levels the prices at which they sold CDs. As a

8  result of their conspiracy, combination and common course of conduct, and despite declining costs

9  of production associated with the introduction of new technologies, Defendants have maintained the

10  prices of Online Music and CDs at supracompetitive levels.

11         57.    Pursuant to their combination, conspiracy and concerted action, Defendants have

12  adopted and adhered to virtually identical and parallel methods of distribution (including the use of

13  contracts with substantially identical material terms) and pricing (including the use of lockstep,

14  identical pricing for virtually every song in their catalogues for Online Music). Defendants are the

15  pivotal and controlling link between the artistic production of the recorded-music product on the one

16  hand, and the marketing and distribution of that product on the other. Defendants distribute recorded

17  music throughout the United States, including recordings produced under Defendants' own labels as

18  well as recordings produced by certain independent music companies.

19         58.    Currently Defendants sell Online Music to retailers and distributors at or about 70

20  cents per song despite improvements in technology of the distribution of Online Music and cost

21  savings with producing CDs, and exponentially increased sales volume that have dramatically

22  reduced marginal costs. Defendants have priced Online Music at supracompetitive levels to protect

23  the market, sales volume, and prices for CDs. Were Defendants to sell Online Music at or

24  approaching competitive pricing levels, sales for CDs would decrease dramatically without

25  concomitant price reductions. In consequence, Defendants' conspiracy to restrain the availability

26  and distribution of Online Music, and to fix and maintain the price of Online Music, enables

27  Defendants to maintain CD prices at supracompetitive levels.

28

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS
& PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW

59.     During the Class Period, each Defendant took actions to restrain the availability and distribution of Online Music. Once it became clear that they could not stem the tide of technological advance, Defendants adopted, at or about the same time, identical terms of sale and pricing schemes for Online Music. Pursuant to their combination, conspiracy and concerted action, Defendants have consistently adopted and adhered to coordinated parallel-pricing schemes.

60.     Defendants have and continue to use trade associations, including the RIAA, and meetings to restrain and control the sale of Online Music and to plan strategy and communicate pricing. During meetings of the recording industry, Defendants discussed how to put Napster out of business and reign in similar threats by distributors of Online Music to their pricing and distribution oligopoly. At a recent meeting, Defendants openly discussed adopting a variable online price scheme (*i.e.*, to charge more for certain singles and less for others).

61.     Each of the Defendants has engaged in one or more overt acts in furtherance of the contract, combination and/or conspiracy alleged. In consequence, the aforesaid combination and conspiracy had the following effects, among others:

(a)     Plaintiff and other members of the Classes were deprived of the benefits of free and open competition in the purchase of Defendants' Online Music and CDs;

(b)     Defendants' Online Music prices were raised, fixed and maintained at artificially high and non-competitive levels;

(c)     Defendants' CD prices were maintained at artificially high and non-competitive levels;

(d)     Plaintiff and other members of the Classes were forced to pay artificially high, non-competitive prices for Online Music and CDs; and

(e)     Price competition among Defendants in the sale of Online Music, and as a direct consequence in the sale of CDs, was restrained, suppressed and eliminated.

62.     During the time period covered by this Complaint, Plaintiff and other members of the Classes purchased substantial quantities of Online Music and CDs sold by Defendants. By reason of the violations of §1 of the Sherman Act, Plaintiff and other members of the Classes paid more for

1   Online Music and CDs than they would have in the absence of the illegal combination, conspiracy

2   and common course of conduct and, as a result, have been injured in their business and property and

3   have suffered damages in an amount currently undetermined.

4       63.     Defendants have acted on grounds generally applicable to the Classes, thereby

5   making final injunctive relief appropriate with respect to the Classes as a whole.

6                                    **COUNT II**

7                               **For Violation of AAA**
    **(On Behalf of End Purchaser Online Music and CD Damages Classes)**
8

9       64.     Plaintiff realleges and incorporates by reference each of the allegations set forth

10  above.

11      65.     Section 1402 of the AAA provides:  "A contract, combination or conspiracy between

12  two or more persons in restraint of trade, or to monopolize, trade or commerce, any part of which is

13  within this state, is unlawful."

14      66.     As alleged above, Defendants entered into a contract, combination or conspiracy in

15  restraint of trade to delay the Online Music market and then to set the wholesale price of Online

16  Music at supercompetative levels, all to protect the CD market.  Such conduct violates Section 1402

17  of the AAA.

18      67.     As a direct and proximate result of the wrongful conduct by Defendants, Plaintiff and

19  each Class member were injured in their business and property in that they have each paid a higher

20  price for Online Music and for CDs than they would have paid absent the unlawful activity.

21      68.     As a result of Defendants' violations of the aforementioned Arizona law prohibiting

22  unfair competition, Plaintiff and the Class are under A.R.S. § 44-1408 entitled to bring this claim

23  and to recover herein compensatory damages, punitive and special damages including but not limited

24  to treble damages, reasonable attorneys' fees, and costs and other injunctive or declaratory relief as

25  may be available.

26

27

28

**COUNT III**

**For Violation of the AAA**
**(On Behalf of End Purchaser Online Music and CD Damages Classes)**

69.     Plaintiff realleges and incorporates by reference each of the allegations set forth above.

70.     Section 1403 of the AAA provides: "The establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful."

71.     As alleged above, Defendants have established, maintained and used a monopoly for purposes of excluding competition and controlling prices within Arizona.  Alternatively, Defendant has attempted to establish a monopoly of trade or commerce for purposes of excluding competition and controlling prices within Arizona.

72.     As a direct and proximate result of the wrongful conduct by Defendants, Plaintiff and each Class member were injured in their business and property in that they have each paid a higher price for Online Music and for CDs than they would have paid absent the unlawful activity.

73.     As a result of Defendants' violations of the aforementioned Arizona law prohibiting unfair competition, Plaintiff and the Class are under A.R.S. § 44-1408 entitled to bring this claim and to recover herein compensatory damages, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees, and costs and other injunctive or declaratory relief as may be available.

**Count IV**
**Unjust Enrichment Under Arizona Law**
**(On Behalf of End Purchase Online Music and CD Damages Classes)**

74.     Plaintiff realleges and incorporates by reference each of the allegations set forth above.

75.     Defendants have benefited finally from their unlawful and inequitable acts alleged in this Complaint.  Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Online Music and CDs stemming from Defendants' combination

1 and conspiracy to restrain trade in Online Music and set the prices for Online Music, and for CDs, at
2 supracompetitive levels.

3     76.    The Classes have conferred upon Defendants an economic benefit, in the nature of
4 profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the members
5 of the Classes.

6     77.    The economic benefit of overcharges and unlawful profits derived by Defendants
7 through charging supracompetitive and artificially inflated prices for Online Music and CI's is a
8 direct and proximate result of Defendants' unlawful practices.

9     78.    The financial benefits derived by Defendants by reason of their unlawful conduct
10 rightfully belong to Plaintiff and the Classes, as they have paid anti-competitive prices during the
11 Class Period, inuring to the benefit of Defendants.

12     79.    It would be inequitable for the Defendants to be permitted to retain any of the
13 overcharges for Online Music and CDs derived from Defendants' unfair and unconscionable
14 methods, acts and trade practices alleged in this Complaint.

15     80.    Defendants should be compelled to disgorge into a common fund for the benefit of
16 Plaintiff and the Classes all unlawful or inequitable proceeds received by them.

17     81.    Alternatively, a constructive trust should be imposed upon all sums unlawfully or
18 inequitably received by Defendants traceable to Plaintiff and the Classes from which Plaintiff and
19 the other Class members may make claims for restitution.

20

21 **PRAYER FOR RELIEF**

22     WHEREFORE, Plaintiff prays that the Court declare, adjudge and decree the following:

23     A.    That this action may be maintained as a class action pursuant to Rule 23(b)(2) of the
24 Federal Rules of Civil Procedure with respect to Plaintiff's claims for declaratory, equitable and
25 injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims
26 for damages and other monetary relief, and declaring Plaintiff as a representative of the Classes and
27 his counsel as counsel for the Classes;

28

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS
& PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW

1       B.     That the conduct alleged herein constitutes an unlawful contract, combination or

2   conspiracy to restrain trade and fix and maintain prices in violation of §1 of the Sherman Act, of the

3   AAA, and the Arizona common law of unjust enrichment;

4       C.     That Plaintiff and the Classes are entitled to any additional damages, penalties and

5   other monetary relief provided by applicable law, including treble damages;

6       D.     That Defendants disgorge money illegally obtained from the Classes as a result of

7   their unlawful activities and that members of the Classes are entitled to restitution.

8       E.     That Plaintiff and each member of the Classes is entitled to the restitution of the

9   amounts by which the Defendants have been unjustly enriched;

10       F.     That Defendants are enjoined from continuing the illegal activities alleged herein;

11       G.     That Plaintiff and the Classes recover their costs of suit, including reasonable

12   attorneys' fees and expenses as provided by law; and

13       H.     That Plaintiff and the Classes are granted such other, further, and different relief as

14   the nature of the case may require or as may be determined to be just, equitable, and proper by this

15   Court.

16                        **JURY DEMAND**

17        Plaintiff demands a trial by jury on all issues so triable.

18

19   DATED: March 22, 2006         **BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.**

20

21

22

23                          Wendy Harrison (State Bar No. 151090)
                        2901 N. Central Avenue, Suite 1000

24                          Phoenix, Arizona 85012

25                          *Attorneys for Plaintiff*

26

27

28

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS & PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW

- 21 -

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

ATTORNEY OF RECORD FOR PLAINTIFF